UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PAUL MITCHELL, III,

     Plaintiff,

v.

GRETCHEN E. WHITMER, and
ROBERT GORDON,

     Defendants.

Civil No.

HON.

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

BUTZEL LONG, P.C.
Daniel J. McCarthy (P59457)
Joseph E. Richotte (P70902)
150 West Jefferson Avenue, Suite 100
Detroit, Michigan 48226
(313) 225-7000
mccarthyd@butzel.com
richotte@butzel.com
*Counsel for Plaintiffs*

Plaintiff Paul Mitchell, III, alleges as follows:

### INTRODUCTION

1.     On March 11, 2020, Governor Whitmer issued Executive Order 2020-04, which declared a "state of emergency" based upon two presumptive diagnoses of coronavirus disease ("**COVID-19**"), a respiratory illness caused by the severe acute respiratory syndrome coronavirus two (the "**coronavirus**").  Shortly thereafter, the Governor began issuing orders that required Michiganders to remain at home and closed most businesses with limited exception, under pain of criminal penalties.

2.     The Governor stated that the initial orders were premised on the perceived emergency need to "flatten the curve" so as to avoid overwhelming the State's hospitals

and healthcare centers, not to eradicate the virus.  Objective data and reporting shows that the curve was flattened during the first week of April 2020.  Exhibit 1, Anderson Economic Group Report.  Yet the Governor has nonetheless continued to issue stricter and unclear executive orders that unreasonably and unnecessarily interfere with constitutional rights under the rubric of a continuing "emergency."

3.     Emergencies, by definition, are temporary.  They are not permanent states of affairs.  The Governor's orders lack objective criteria by which to measure when the "emergency" is over.  In this regard, the Governor has stated that she alone will decide when the emergency will end.

4.     There is no question that infectious diseases are, unfortunately, a part of everyday life.  Some are more susceptible to certain illnesses than others.  But Michiganders can and do take reasonable, private action to protect themselves from infection without the need to shut down civil society.  Given that the projected surge has not occurred, there is no basis, either legally or factually, to continue any further mandatory lockdown orders under criminal penalty.

5.     Mitchell seeks a judicial declaration that the executive orders—and all other orders, rules, and enforcement activity related to them—are unconstitutional under the Guarantee Clause, the Privileges or Immunities Clause, the Due Process Clause, the Equal Protection Clause, and State law.  Such a declaration, and a corresponding injunction, will yield a more rational, pragmatic response to the virus that saves lives, saves livelihoods, and preserves constitutional norms all at the same time.

6.     In short, Mitchell brings this lawsuit to define the limits of a State's police power.  The issues raised in this Complaint are novel, and they will not be rendered moot if the executive order is lifted before the Court issues judgment.  Indeed, the Governor has described her emergency powers as a "dial" that can be turned up or down at will.  Thus, the issues presented are capable of repetition and are of such importance that they cannot evade judicial review.

## PARTIES

7.     Plaintiff Paul Mitchell, III, is a citizen of the United States, a citizen of the State of Michigan, and domiciled in Lapeer County, Michigan.

8.     Defendant Gretchen E. Whitmer is the Governor of the State of Michigan. Mitchell sues her in her official capacity only.

9.     Defendant Robert Gordon is the Director of the Michigan Department of Health and Human Services.  Mitchell sues him in his official capacity only.

## JURISDICTION

10.     This action arises under 42 U.S.C. § 1983 and challenges Governor Whitmer's Executive Orders 2020-42, 2020-59, 2020-67, 2020-68, 2020-69, and 2020-70 (and their predecessors and future iterations of these orders) (the "**EOs**") and Director Gordon's Emergency Order and Emergency Rule (all collectively, the "**Lockdown Orders**"), which violates the following clauses of the U.S. Constitution:

(a)     the Guarantee Clause of Article IV, Section 4;

(b)     the Privileges or Immunities Clause of the Fourteenth Amendment;

(c)     the Due Process Clause of the Fourteenth Amendment; and

(d)     the Equal Protection Clause of the Fourteenth Amendment.

The Court therefore has federal-question jurisdiction under Article III of the U.S. Constitution and 28 U.S.C. § 1331.

11.     Mitchell seeks declaratory relief and a preliminary and permanent injunction against the Lockdown Orders and similarly crafted orders and rules issued in the future.  Accordingly, he also brings this action under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the All Writs Act, 28 U.S.C. § 1651.

12.     Mitchell also challenges the EOs as exceeding the Governor's authority under the separation-of-powers doctrine enshrined in Article III, Section 2 of the Michigan Constitution of 1963; the Emergency Powers of the Governor Act ("**Emergency Powers Act**"), Mich. Comp. Laws §§ 10.31–10.33; and the Emergency Management Act,

Mich. Comp. Laws §§ 30.401–30.421.  Accordingly, Mitchell also invokes the Court's supplemental jurisdiction under 28 U.S.C. § 1367.

## VENUE

13.     Governor Whitmer is a resident of, and the principal office of the Governor is located in, Lansing, Michigan.

14.     Director Gordon's principal office is located in Lansing, Michigan.

15.     A substantial part of the events giving rise to the claims in this Complaint occurred in Lansing, Michigan.

16.     The city of Lansing is the seat of government for the State of Michigan. Michigan Const. art. III, § 1 (1963).  It is located within Ingham County, which is within the territorial jurisdiction of the Western District of Michigan.  28 U.S.C. § 102(b)(1). This Court is therefore a proper venue for this action under 28 U.S.C. § 1391(b)(1)–(2).

## EXECUTIVE ACTION

***Executive Orders***

17.     The Emergency Powers Act permits a governor, "during times of great public crisis, disaster, rioting, catastrophe, or similar public emergency within the State, or reasonable apprehension of immediate danger of a public emergency of that kind, when public safety is imperiled, … [to] proclaim a state of emergency and designate the area involved … [and to] promulgate ***reasonable*** orders, rules, and regulations as he or she considers necessary to protect life or property or to bring the emergency situation within the affected area under control."  Mich. Comp. Laws § 10.31(1) (emphasis added). Executive orders issued under this Act have the force of law.

18.     The Emergency Management Act permits a governor, upon the declaration of an emergency or a disaster, to compel evacuation, to control entry to, exit from, and the occupancy of premises within, the affected area, among other things.  Mich. Comp. Laws § 30.405(1).  Executive orders issued under this Act have the force of law.

19.     On March 20, 2020, the Governor issued Executive Order 2020-17 under both Acts.  This order required hospitals, freestanding surgical outpatient facilities, and dental facilities to postpone "nonessential" medical procedures until after the Governor declares the "state of emergency" to be over.  A willful violation of EO 2020-17 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-17(7).

20.     On March 22, 2020, the Governor issued Executive Order 2020-20 under both Acts.  This order closed to the public a wide range of public accommodations, including all restaurants, food courts, cafes, coffeehouses, and other places of public accommodation offering food or beverages for on-site consumption.  A willful violation of EO 2020-20 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-20(6).

21.     On March 23, 2020, the Governor issued Executive Order 2020-21 under both Acts.  This order prohibits all in-person work that the Governor deems "not necessary to sustain or protect life."  A willful violation of EO 2020-21 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-20(6).

22.     On April 9, 2020, the Governor issued Executive Order 2020-42 under both Acts.  This order extends EO 2020-21 through April 30, 2020, while imposing even greater restrictions on the general public than before.  A willful violation of EO 2020-42 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-42(17).

23.     On April 13, 2020, the Governor issued Executive Order 2020-43 under both Acts.  This order extends EO 2020-20 through April 30, 2020. A willful violation of EO 2020-43 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-42(7).

24.     On April 24, 2020, the Governor issued Executive Order 2020-59 under both Acts.  This order extends EO 2020-42 through May 15, 2020.  It purports to loosen some restrictions imposed under EO 2020-42 as part of a phased reopening of the economy.  A willful violation of EO 2020-59 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-59(20).

25.     On April 30, 2020, the Governor issued Executive Order 2020-67 under the Emergency Powers Act.  This order extends the original declaration of a state of emergency under the Act through May 28, 2020.  Mich. Comp. Laws § 10.33; EO 2020-67(1).

26.     The same day, the Governor issued Executive Orders 2020-66 and 2020-68 under the Emergency Management Act.  EO 2020-66 declared an end to the state of emergency and the state of disaster declared under the Emergency Management Act because the Legislature declined to grant an extension of those declarations, as is its right under the Act.  EO 2020-68 purports to declare a "new" state of emergency and a "new" state of disaster, citing the same public-health grounds as before.

27.     The same day, the Governor also issued Executive Order 2020-69 under both Acts.  This order effectively extends EO 2020-43, but under the authority of the "new" declared emergencies under EO 2020-67 and 2020-68.  A willful violation of EO 2020-69 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-69(7).

28.     On May 1, 2020, the Governor issued Executive Order 2020-70 under both Acts.  This order effectively extends EO 2020-59, while purporting to loosen some additional restrictions as part of a phased reopening of the economy.   A willful violation of EO 2020-59 is a misdemeanor for which a person can be imprisoned for up to 90 days and fined up to $500.  Mich. Comp. Laws §§ 10.33, 30.405(3), and 750.504; EO 2020-70(20).

*Action by MDHHS*

29.     On April 2, 2020, Director Gordon issued an Emergency Order under the Michigan Public Health Code.  Mich. Comp. Laws § 333.2253(1).  This order requires every person in Michigan to comply with EO 2020-20, EO 2020-21, and the answers to frequently asked questions ("**FAQs**") on the State's coronavirus webpage.  https:// perma.cc/K6ZH-HS6N.  This order also applies to EOs 2020-42, 2020-43, 2020-59, and 2020-69.

30.     At the same time, Director Gordon issued an Emergency Rule establishing a $1,000 civil penalty for violations of the Emergency Order.  https://perma.cc/ 8W5C-E98N.

31.     A violation of an MDHHS order or rule is a misdemeanor punishable by imprisonment for up to six months and a fine of $200, or both.  Mich. Comp. Laws § 333.2261.  Thus, the Emergency Order and the Emergency Rule effectively double the period of incarceration authorized under the Governor's executive orders.

32.     So, since April 2, 2020, any person who violates the EOs (and thereby violates the Emergency Order and the Emergency Rule) can now be imprisoned for up to six months, assessed a penal fine of up to $500, and assessed a civil fine of up to $1,000.

33.     Mitchell incorporates all of the paragraphs in this Complaint into each of the following causes of action.

## COUNT  I
### DECLARATORY JUDGMENT
### GUARANTEE CLAUSE

34.     There is an actual and present controversy between the parties.

35.     Under the Guarantee Clause of Article IV, Section 4 of the U.S. Constitution, "[t]he United States shall guarantee to every State in this Union a Republican Form of Government." The essence of a republican form of government is self-government through elected representatives.

36.     The people of Michigan adopted a republican form of government with the adoption of the Michigan Constitution of 1963, which vested all legislative powers in the Legislature.  Through the Legislature, the people of Michigan engage in self-government by their elected representatives.  Mich. Const. art. III, § 2 (1963); Mich. Const. art. IV, § 1 (1963).

37.     As the Governor has interpreted and applied the Emergency Powers Act and the Emergency Management Act through the EOs, she has full and unchecked power to govern by executive fiat.  No governor has the power to keep the entire State on lockdown indefinitely and suspend self-government merely by declaring a "new" emergency or a "new" disaster every 28 days.  Government by one person with absolute power is not a republican form of government, it is an autocracy.  It is, in all material respects, the same kind of government from which we declared our independence 244 years ago.

38.     Invoking the State's "police powers," a legal term of art, is not license to slide, even temporarily, from a republican form of government.  Police powers flow from a State's constitution and the common law, but those powers remain at all times subject to the constitutional limits imposed on government, including its permissible form.  Police powers never trump a State's constitution or the U.S. Constitution.

39.     Mitchell contends that the EOs violate the Guarantee Clause of Article IV, Section 4 of the U.S. Constitution because they deprive him, and the people of Michigan, of a republican form of government.

40.     On information and belief, Governor Whitmer denies these contentions.

41.     Mitchell seeks a declaration that the EOs violate the Guarantee Clause, and an injunction against enforcement or adoption of these and similar EOs in the future as described in the Prayer for Relief.

## COUNT  II
## PRIVILEGES OR IMMUNITIES CLAUSE
### 42 U.S.C. § 1983

42.   The Privileges or Immunities Clause of the Fourteenth Amendment to the U.S. Constitution provides that "[n]o State [can] make or enforce any law [that] abridge[s] the privileges or immunities of citizens of the United States."  U.S. Const. am. XIV, § 1, cl. 2.

43.   The right to live under a republican form of State government is a privilege of federal citizenship established by the Guarantee Clause of Article IV, Section 4 of the U.S. Constitution.

44.   The right to engage in interstate travel is a privilege of federal citizenship under the Privileges and Immunities Clause of Article IV, Section 2 of the U.S. Constitution.

45.   The right to travel to another state to obtain medical care is a privilege of federal citizenship under the Privileges and Immunities Clause of Article IV, Section 2 of the U.S. Constitution.

46.   Governor Whitmer acted under color of State law in an official capacity and within the scope of her official duties when issuing the EO.

47.   The EOs deprive Mitchell of these privileges of federal citizenship:

(a)   ***Guarantee Clause.***  For the reasons stated in Count I, the EOs deprive Mitchell of the right to live under a republican form of government.

(b)   ***Right to Obtain Medical Care.***  The right to obtain medical care is a protected liberty interest.  Mitchell has been diagnosed with osteoarthritis, a condition resulting in painful bone-on-bone contact in his knee.  The Lockdown Orders have prevented, and are preventing, Mitchell from seeking medical treatment for this painful condition in another state.

48.   Mitchell seeks an injunction against further infringements of his rights under the Privileges or Immunities Clause as described in the Prayer for Relief.

# COUNT  III
## PROCEDURAL DUE PROCESS
### 42 U.S.C. § 1983

49.     The Due Process Clause of the Fourteenth Amendment to the U.S. Consti-tution provides that no State can "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV, § 1, cl. 3.

50.     The procedural component of the Due Process Clause prohibits government from depriving Plaintiffs of liberty and property interests without providing any process before or after the deprivations occurred.

51.     To establish a procedural due process claim under 42 U.S.C. § 1983, a plaintiff must show that (1) it had a life, liberty, or property interest protected by the Due Process Clause; (2) it was deprived of this protected interest; and (3) the state did not afford it adequate procedural rights.  See *Daily Servs., LLC* v. *Valentino*, 756 F.3d 893, 904 (CA6 2014).

52.     Mitchell had and has a protected liberty interest in the right to live without arbitrary governmental interference with his liberty and property interests.  *County of Sacramento* v. *Lewis*, 523 U.S. 833, 845 (1988).

53.     Liberty "denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized … as essential to the orderly pursuit of happiness by free men." *Board of Regents of State Colleges* v. *Roth*, 408 U.S. 564, 572 (1972) (emphases added).

54.     The Lockdown Orders infringed, and continue to infringe upon, Mitchell's liberty and property interests in the following ways:

(a)     ***Intrastate Travel.***  The right to engage in intrastate travel is a protected liberty interest.  *Johnson* v. *City of Cincinnati*, 310 F.3d 484, 495 (CA6 2002).  The Lockdown Orders prohibited Mitchell from traveling within Michigan to visit family and

friends, and from traveling to a second home in Emmet County, Michigan.

(b)     ***Political Association.***  The right of association is a protected liberty interest under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. *NAACP* v. *Alabama*, 357 U.S. 449 (1958).  Over the course of many years, Mitchell has developed relationships with neighbors, business leaders, and others, and associates with them through lawful group political activities.  The Lockdown Orders have prevented and are preventing planned events from occurring, depriving Mitchell of his right of association.

(c)     ***Political Speech.***  The right to freely engage in political speech is a protected liberty interest under the Speech Clause of the First Amendment to the U.S. Constitution and the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.  Both in conjunction with the associational activities just described and separately from them, Mitchell regularly engages in political speech, in person, with his neighbors, business leaders, and others to share his political views on matters of public policy and to support candidates for public office.  The Lockdown Orders have prevented and are preventing Mitchell from in-person political speech.  Because of limitations imposed by cost and accessibility, technology does not and cannot supplant direct and group interaction when communicating about matters of political concern.  There are national, state, and local races for public office this fall, making in-person communication crucial to meaningful participation in free and fair elections.

(d)     ***Right to Obtain Medical Care.***  The right to obtain medical care is a protected liberty interest.  Mitchell has been diagnosed with osteoarthritis, a condition resulting in painful bone-on-bone contact in his knee.  The Lockdown Orders have prevented, and are preventing, Mitchell from obtaining medical treatment for this painful condition in Michigan or in another state.

(e)     ***Right to Engage in Commerce.***  Mitchell lives on a farm in Dryden, Michigan, with his family.  Before the Lockdown Orders, Mitchell obtained permits to demolish an

old structure on the farm to make way for a new barn and other improvements in preparation for the launch of a private wool business.  The barn is necessary to house farming equipment needed for the planned business and for other activities that support the family farm.  Mitchell cannot build the barn without skilled labor, lumber, and other supplies.  The Lockdown Orders have prevented him from securing the supplies and hiring the labor necessary to build a suitable structure. They have also precluded him from undertaking other efforts to support the development of this business.  The Lockdown Orders therefore infringed, and continue to infringe, upon his mixed liberty and property interests in starting a lawful business, acquiring livestock, and making physical improvements to his land.

(f)     ***Deprivation of Property Interest.***  Mitchell owns a second home in Emmet County, Michigan.  Before the Lockdown Orders, he had contracted for improvements to that residence, including exterior repairs necessary to keep rain, snow, and other elements out of the home.  Those improvements and repairs were underway when Governor Whitmer and Director Gordon issued the Lockdown Orders.  On information and belief, based on those orders, the Emmet County Sheriff's Department pulled work permits and started visiting worksites around the county to inform workers that their work was prohibited under the Lockdown Orders and that they would be fined if work continued. Once they became aware of the Lockdown Orders and the Emmet County Sheriff's interpretation of those orders, those working at Mitchell's Emmet County residence stopped working.  The work remains unfinished, exposing the residence to damage from the elements.

55.     Neither Governor Whitmer nor Director Gordon provided any procedural due process before issuing the Lockdown Orders.  Nor do the Lockdown Orders provide any mechanism for post-deprivation review.

56.     Governor Whitmer and Director Gordon acted under color of State law in an official capacity and within the scope of their official duties when issuing the Lockdown

Orders.

57.     As a direct and proximate cause of the failure to provide any pre- or post-deprivation process, Mitchell has suffered and is suffering prejudice from the aforementioned infringements on his liberty and property interests under threat of criminal and civil sanctions.

58.     Mitchell seeks an injunction against further infringements of his rights under this Clause as described in the Prayer for Relief.

## COUNT IV
## SUBSTANTIVE DUE PROCESSS
### 42 U.S.C. § 1983

59.     The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no State can "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1, cl. 3.

60.     The substantive component of the Due Process Clause prohibits government from taking action that "shocks the conscience" or "interferes with rights implicit in the concept of ordered liberty." *United States* v. *Salerno*, 481 U.S. 739, 746 (1987) (cleaned up).

61.     Mitchell has a protected liberty interest in the right to live without arbitrary governmental interference with his liberty and property interests. *County of Sacramento* v. *Lewis*, 523 U.S. 833, 845 (1988).

62.     Liberty "denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness by free men." *Board of Regents of State Colleges* v. *Roth*, 408 U.S. 564, 572 (1972) (emphases added).

63.     The Lockdown Orders shock the conscience, and they have interfered, and continue to interfere, with the deeply-rooted liberty and property rights described in Counts II and III.

64.     The Lockdown Orders are not narrowly tailored to achieve a compelling governmental interest.  In the alternative, they are not reasonably related to a legitimate governmental interest.

65.     Governor Whitmer and Director Gordon acted under color of State law in an official capacity and within the scope of their official duties when issuing the Lockdown Orders.

66.     Mitchell seeks a declaration that the Lockdown Orders violate the substantive component of the Due Process Clause, and an injunction against further infringements of his rights under this Clause as described in the Prayer for Relief.

### COUNT  V
### DECLARATORY JUDGMENT
### VOID FOR VAGUENESS

67.     There is an actual and present controversy between the parties.

68.     Plaintiffs contend that the Lockdown Orders are unconstitutionally vague under the void-for-vagueness doctrine under the U.S. and Michigan constitutions.

69.     The void-for-vagueness doctrine requires penal laws to define criminal conduct with sufficient precision that ordinary people can understand what conduct is prohibited, and in a manner that does not encourage arbitrary and discriminatory enforcement.  *Kolender* v. *Lawson*, 461 U.S. 352, 357–358 (1983).  This doctrine flows from the Due Process Clause.  *Michigan Dep't of State Compliance & Rules Div.* v. *Michigan Educ. Ass'n*, 251 Mich. App. 110, 116 (2002); U.S Const., am. XIV; Mich. Const. (1963), art. I, § 17.

70.     The Lockdown Orders purport to carry the force of law and (with the exception of Director Gordon's Emergency Rule) makes any willful violation of their

terms a misdemeanor punishable by imprisonment or a fine. It is therefore subject to the void-for-vagueness doctrine.

71.     The very fact that the Governor needs a webpage to answer "frequently asked questions" about the scope of the order shows that it's vague. Michiganders are smart people. If "ordinary people" could understand the Lockdown Order, then there would be no need for *125+ FAQs* on these orders on the State's coronavirus webpage.

72.     EO 2020-17 prohibits hospitals and other covered facilities from performing nonessential medical procedures during the declared state of emergency. The order vaguely defines nonessential procedures to be any medical or dental procedure that is not necessary to address a medical emergency or to preserve the health and safety of a patient, as determined by a licensed provider. EO 2020-17(1). Later in the order, however, it specifies certain procedures that must be postponed, including joint replacement, except on an emergency basis where postponement would significantly impact the health, safety, and welfare of the patient. EO 2020-17(2). The order does not define what constitutes an "emergency" or a "significant impact."

73.     On May 1, 2020, Dr. Joneigh S. Khaldun, the State's chief medical executive, signaled at a press conference that those who think they need to be seen for important and time sensitive medical care should contact their physician for treatment. At the same press conference, Governor Whitmer signaled that, in fact, the restrictions in EO 2020-17 have been informally loosened: "We are encouraging anyone who has been holding off on surgery that really needs to be done to get that scheduled and proceed."

74.     Yet, it remains a crime for a physician to provide treatment that a law enforcement official may deem nonessential under EO 2020-17. See EO 2020-17(7). It also remains a crime for patients to leave their homes and travel for nonessential medical treatment under EO 2020-70 and previous iterations of that order. See EO 2020-70(2), (7)(a)(6), and (20).

75.     Because Mitchell cannot travel out of state for medical procedures as alleged in Counts II and III, he desires to seek medical treatment for his medical condition at an in-state medical facility.

76.     No Michigander, including Mitchell, should be forced to choose between risking criminal prosecution and economic sanctions under the Lockdown Orders on the one hand, or seeking medical treatment on the other.

77.     On information and belief, Governor Whitmer and Director Gordon deny these contentions.

78.     Plaintiffs seek a judicial declaration that the Lockdown Orders are void for vagueness, and an injunction against enforcement or adoption of these and similar orders and rules in the future as described in the Prayer for Relief.

## COUNT VI
## DECLARATORY JUDGMENT
## SEPARATION OF POWERS

79.     There is an actual and present controversy between the parties.

80.     Since the Lockdown Orders have been in place, Mitchell desired and still desires to engage in the following activity:

(a)     to gather in-person with others to exercise his right to political speech and his right of association;

(b)     to engage in the commerce necessary to obtain the labor and supplies necessary to build a suitable structure for livestock in support of his lawful business venture;

(c)     to engage in the commerce necessary to protect the value of his property in Emmet County; and

(d)     to obtain so-called "nonessential" medical treatment for his painful medical condition.

81.     The Lockdown Orders prohibited Mitchell from engaging in these activities under threat of civil and criminal penalty.  Several of these activities are still prohibited or severely curtailed under the versions of the Lockdown Orders in effect as of the date of this Complaint.  But for the Lockdown Orders, he would have been and would be free to engage in these activities.

82.     Mitchell contends that the Lockdown Orders are invalid because they violate the Separation of Powers Clause in Article III, Section 2 of the Michigan Constitution.

83.     The Separation of Powers Clause provides that "[t]he powers of government are divided into three branches: legislative, executive, and judicial.  No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution."  Mich. Const. (1963) art. III, § 2.

84.     The Emergency Powers Act violates the Separation of Powers Clause because it vests governors with total legislative power whenever a governor asserts the existence of an emergency.

85.     The Emergency Management Act does not violate the Separation of Powers Clause on its face, but it does as Governor Whitmer has applied it.  As the Governor appears to construe it, the Emergency Management Act gives her limitless powers equal in scope to the Emergency Powers Act.  The language of the Act does not confer such unlimited powers on the Governor.

86.     The Public Health Code does not violate the Separation of Powers on its face, but it does as Director Gordon has applied it.  As Director Gordon appears to construe it, the Public Health Code gives him limitless power to place the entire State under house arrest, the power to define "critical" or "essential" businesses, and the power to shutter "noncritical" and "nonessential" businesses indefinitely.  The Public Health Code does not confer such power on the Director.

87.     On information and belief, Governor Whitmer and Director Gordon deny these contentions.

88.     Mitchell seeks a declaration that the Lockdown Orders violate the Separation of Powers Clause, and an injunction against enforcement or adoption of these and similar orders and rules in the future as described in the Prayer for Relief.

## COUNT  VII
### DECLARATORY JUDGMENT
### UNLAWFUL EXERCISE OF EMERGENCY POWERS ACT

89.     There is an actual and present controversy between the parties.

90.     Since the Lockdown Orders have been in place, Mitchell desired and still desires to engage in the following activity:

(a)     to gather in-person with others to exercise his right to political speech and his right of association;

(b)     to engage in the commerce necessary to obtain the labor and supplies necess-ary to build a suitable structure for livestock in support of his lawful business venture;

(c)     to engage in the commerce necessary to protect the value of his property in Emmet County; and

(d)     to obtain so-called "nonessential" medical treatment for his painful medical condition.

91.     The Lockdown Orders prohibited Mitchell from engaging in these activities under threat of civil and criminal penalty.  Several of these activities are still prohibited or severely curtailed under the versions of the Lockdown Orders in effect as of the date of this Complaint.

92.     If the EOs pass constitutional muster, Mitchell contends in the alternative that they violated and still violate the Emergency Powers Act.

93.     Viruses, like SARS-CoV-2, and the diseases they can cause, like COVID-19, are not the kind of emergencies contemplated under the Emergency Powers Act, which applies "[d]uring times of great public crisis, disaster, rioting, catastrophe, or similar public emergency within the state, or reasonable apprehension of immediate danger of a public emergency of that kind, ***when public safety is imperiled***...."  Mich. Comp. Laws § 10.31.

94.     Public health and public safety are distinct legal concepts.  Governor Whitmer has not identified a public ***safety*** emergency in any of the EOs.  Instead, she only selectively quoted from the portion of the Act that allows her to issue orders necessary to protect life or property or to bring the emergency under control.  EO 2020-42, Preamble ¶ 4.  Absent a public safety emergency, the Governor has no power to issue orders under the Emergency Powers Act at all.  Neither SARS-CoV-2 nor COVID-19 have presented a public safety emergency.

95.     Alternatively, even if SARS-CoV-2 or COVID-19 qualify as a public safety emergency, the Emergency Powers Act does not authorize the *de facto* statewide house arrest imposed under the EOs.  The Act says a governor may "designat[e] ***specific zones*** within the area in which occupancy and use of buildings and ingress and egress of persons and vehicles may be prohibited or regulated."  Mich. Comp. Laws § 10.31(1).  Governor Whitmer, however, has regulated occupancy and use of buildings statewide.  The EOs violate the Act because it is not limited to specific zones within Michigan.

96.     Alternatively, the Emergency Powers Act only authorizes a governor to issue ***reasonable*** orders that are considered necessary to protect life or property or to bring the emergency under control.  Mich. Comp. Laws § 10.31(1).

97.     The EOs are objectively unreasonable.  Michigan has 83 counties.  As of May 1, 2020, four counties in Michigan had no confirmed cases, and 33 counties had fewer than 25 cases.  As of that same date, of the counties with confirmed cases, 21 counties had no deaths.  Of the 62 counties with reported deaths, 37 counties had less

than 10 deaths.  In other words, 70% of Michigan counties have less than 10 deaths.  There can be nothing more unreasonable than keeping 10 million people under house arrest because 0.42% of the population has contracted a disease that has killed less than 0.04% of the population.

98.     It is also unreasonable to institute and maintain executive orders under the Emergency Powers Act that cause nearly 1.2 million men and women to lose their jobs virtually overnight, to cripple businesses, or to cause businesses to permanently close, especially when many of these people reside in counties with less than 25 cases and far fewer (or even no) deaths.  Michigan is among the top five worst states for unemployment. Exhibit 1, AEG Report.  According to Jeff Donofrio, Director of the Michigan Department of Labor and Economic Opportunity, this means more than 25% of Michigan's workforce filed for unemployment in the span of four weeks because of the Lockdown Orders.  For context, the national average unemployment rate during the Great Depression of 1929 was 26%.

99.     On information and belief, Governor Whitmer denies these contentions.

100.     Mitchell seeks a declaration that the EOs violate the Emergency Powers Act, an injunction against enforcement or adoption of these and any similar EOs in the future as described in the Prayer for Relief.

### COUNT  VIII
### DECLARATORY JUDGMENT
### UNLAWFUL EXERCISE OF EMERGENCY MANAGEMENT ACT

101.     There is an actual and present controversy between the parties.

102.     Since the Lockdown Orders have been in place, Mitchell desired and still desires to engage in the following activity:

(a)     to gather in-person with others to exercise his right to political speech and his right of association;

(b)     to engage in the commerce necessary to obtain the labor and supplies necessary to build a suitable structure for livestock in support of his lawful business venture;

(c)     to engage in the commerce necessary to protect the value of his property in Emmet County; and

(d)     to obtain so-called "nonessential" medical treatment for his painful medical condition.

103.    The Lockdown Orders prohibited Mitchell from engaging in these activities under threat of criminal penalty.  Several of these activities are still prohibited or severely curtailed under the versions of the Lockdown Orders in effect as of the date of this Complaint.

104.    If the EOs pass constitutional muster, Mitchell contends in the alternative that they violated and still violate the Emergency Management Act.

105.    The Emergency Management Act permits a governor to declare a disaster in response to the occurrence of threat of widespread loss of life resulting from natural causes, including an epidemic.  See Mich. Comp. Laws § 30.402(e) (including epidemics in the list of causes of disasters).  Thus, infectious diseases by themselves are not a permissible reason to invoke the Act—the disease must reach or threaten to reach epidemic status.

106.    Although the World Health Organization has classified SARS-CoV-2 as a pandemic, that is not controlling under Michigan law.  The existence of an epidemic must be determined solely from the perspective of the facts as they exist on the ground *in Michigan*.

107.    With confirmed infections affecting only 0.42% of the State as of the date of this Complaint, no epidemic actually exists throughout all of Michigan.  While a regional epidemic *likely* exists in a few densely populated areas, one does not exist in all 83

counties in Michigan, as demonstrated by persistently low numbers of infections and deaths in the majority of Michigan's counties.

108.    In addition, the Emergency Management Act does not contemplate declaring the entire State a disaster area.  Among other things, the Act allows a governor to issue orders affecting a "stricken" or "threatened" area, including mandatory evacuation orders, controlling ingress and egress from that area, and the occupancy of premises within that area.  Mich. Comp. Laws § 30.405(1)(e)–(g).

109.    For example, approximately 87,600 people live in Lapeer County, where Mitchell lives.  As of May 1, 2020, there were 171 confirmed cases of COVID-19 and 25 deaths since the Governor declared an emergency.  In other words, confirmed cases represent 0.195% of the population in Lapeer County.  The death toll represents 0.028% of Lapeer County's population.  These small numbers of cases and deaths did not and do not qualify as an epidemic in Lapeer County.

110.    Moreover, even when grounds exist to declare a disaster, the executive order must indicate, among other things, the nature of the conditions permitting the termination of the state of disaster.  Mich. Comp. Laws § 30.403(3).  None of Governor Whitmer's executive orders have articulated objective conditions that, when satisfied, would permit the termination of the state of disaster.

111.    Furthermore, under the Emergency Management Act, a declared emergency or disaster automatically expires after 28 days or after such additional time as the Legislature may authorize.  Mich. Comp. Laws § 30.403(3)–(4).  The Act does not allow a governor to declare "new" emergencies and "new" disasters based on the same underlying circumstances that gave rise to the original declaration when the Legislature has declined to extend the declaration.  Nor is it a valid exercise of power under the Emergency Management Act to justify a "new" emergency or disaster by purporting to respond to the consequences of executive orders issued during the original declaration. The Legislature granted one extension of the declared emergency and disaster under the

Act, and it was fully aware of the effects of the coronavirus, the rate of COVID-19 cases and deaths, and the economic fallout from the virus and the Lockdown Orders, when it declined to grant an additional extension.  A governor cannot ignore or end-run the Legislature's decision just because he or she disagrees with it, as has happened here.

112.    On information and belief, Governor Whitmer denies these contentions.

113.    Mitchell seeks a declaration that the EOs violate the Emergency Management Act, an injunction against enforcement and adoption of these and any similar EOs in the future as described in the Prayer for Relief.

**COUNT  IX**
**DECLARATORY JUDGMENT**
**UNLAWFUL EXERCISE OF PUBLIC HEALTH CODE**

114.    There is an actual and present controversy between the parties.

115.    Since the Lockdown Orders have been in place, Mitchell desired and still desires to engage in the following activity:

(a)    to gather in-person with others to exercise his right to political speech and his right of association;

(b)    to engage in the commerce necessary to obtain the labor and supplies necessary to build a suitable structure for livestock in support of his lawful business venture;

(c)    to engage in the commerce necessary to protect the value of his property in Emmet County; and

(d)    to obtain so-called "nonessential" medical treatment for his painful medical condition.

116.    The Emergency Order and Emergency Rule prohibited Mitchell from engaging in these activities under threat of civil and criminal penalty.  Several of these activities are still prohibited or severely curtailed under the Emergency Order and Emergency Rule as of the date of this Complaint.

117.    If the Lockdown Orders pass constitutional muster, Mitchell contends in the alternative that the Emergency Order and Emergency Rule violated and still violate the Public Health Code.

118.    The Public Health Code permits the director of the Michigan Department of Health and Human Services to issue an emergency order prohibiting the gathering of people for any purpose and may establish procedures to be followed during an epidemic to "ensure the continuation of essential public health services and enforcement of health laws." Mich. Comp. Laws § 333.2255(1). Thus, infectious diseases by themselves are not a permissible reason to issue such orders under the Public Health Code—the disease must actually reach epidemic status before the director has the power to issue an emergency order.

119.    Although the World Health Organization has classified SARS-CoV-2 as a pandemic, that is not controlling under Michigan law. The existence of an epidemic must be determined solely from the perspective of the facts as they exist on the ground *in Michigan*.

120.    With confirmed infections affecting only 0.42% of the State as of the date of this Complaint, no epidemic actually exists throughout all of Michigan. While a regional epidemic *likely* exists in a few densely populated areas, one does not exist in all 83 counties in Michigan, as demonstrated by persistently low numbers of infections and deaths in the majority of Michigan's counties.

121.    For example, approximately 87,600 people live in Lapeer County, where Mitchell lives. As of May 1, 2020, there were 171 confirmed cases of COVID-19 and 25 deaths since the Governor declared an emergency. In other words, confirmed cases represent 0.195% of the population in Lapeer County. The death toll represents 0.028% of Lapeer County's population. These small numbers of cases and deaths did not and do not qualify as an epidemic in Lapeer County. Accordingly, Director Gordon lacked and lacks the authority to issue an emergency order under the Public Health Code with respect to

Lapeer County.

122.    The Emergency Rule is unenforceable because it purports to enforce the Emergency Order, which is unenforceable.

123.    On information and belief, Director Gordon denies these contentions.

124.    Mitchell seeks a declaration that the Emergency Order and Emergency Rule violate the Public Health Code, and an injunction against enforcement and adoption of the Emergency Order, the Emergency Rule, and any similar orders and rules in the future as described in the Prayer for Relief.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Paul Mitchell, III, respectfully asks the Court to grant him the following relief:

1.    A declaratory judgment that the Lockdown Orders:

(a)    Violate his constitutional rights as set forth in this Complaint;

(b)    are void for vagueness; and/or

(c)    violate the Separation of Powers Clause of the Michigan Constitution, the Emergency Powers Act, the Emergency Management Act, and/or the Public Health Code;

2.    Enjoin Governor Whitmer and Director Gordon from enforcing the Lockdown Orders and from issuing any future orders or rules similar to the invalid ones described in this action;

3.    Award him reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988 and any other applicable law; and

4.    Any other such further relief to which he may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

## JURY DEMAND

Under the Seventh Amendment to the U.S Constitution and Rule 38(b) of the Federal Rules of Civil Procedure, Mitchell demands trial by jury on all issues so triable.

Respectfully submitted,

BUTZEL LONG, P.C.

DANIEL J. MCCARTHY    P59457

Dated:  May 4, 2020

DANIEL J. McCARTHY (P59457)
JOSEPH E. RICHOTTE (P70902)
150 West Jefferson Avenue, Suite 100
Detroit, Michigan 48226
(313) 225-7000
mccarthyd@butzel.com
richotte@butzel.com
*Counsel for Plaintiffs*

BH2896777.11